# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| ZHEJIANG KING-MAZON, ) | CASE NO. 1:13 CV 1363 |
| ) | |
| Plaintiff, ) | JUDGE DAN AARON POLSTER |
| ) | |
| vs. ) | **MEMORANDUM OF OPINION** |
| ) | **AND ORDER** |
| RISK INDUSTRIES, LLC, d/b/a ) | |
| Pine Technology, et al., ) | |
| ) | |
| Defendants. ) | |

Before the Court is the Motion to Dismiss of Defendants Ian Williamson, Kile Frederick Snyder, Tim Kreja and David Ekers (collectively, "the Individual Defendants" or "the Moving Defendants"). (**Doc #: 28** ("Motion").) The Motion addresses the Second Amended Complaint filed by Plaintiff Zhejiang King-Mazon ("SAC"). (Doc #: 24.) The Individual Defendants seek dismissal of the claims asserted against them because, among other things, they cannot be held personally liable for the debts of Defendant Risk Industries, LLC. For the following reasons, the Court **DENIES** the Motion.

I.

Plaintiff Zhejiang King-Mazon (hereafter, "KM") is in the business of manufacturing tube-bending and end-forming machinery and component parts. (SAC ¶ 21.) From 2009 to 2012, Deft Risk Industries, LLC ("Risk") purchased KM's machinery and sold it in the United States. (Id. ¶ 2.) It did so pursuant to a contract that required Risk to make a 30% down payment before KM would begin manufacturing the machinery ("Old Agreement"). (Id. ¶¶ 2,

33.)

In March 2012, however, Risk, through its agent Rajab Aghasharif, approached KM in China with the following proposition. Aghasharif, who spoke on behalf of CEO Williamson, represented that Risk wanted to be the exclusive dealer for KM's equipment in North and South America – and that Risk already had an office in Mexico and expected to open an office in Brazil. (Id. ¶¶ 36, 40.) He stated that the Old Agreement was not beneficial to the parties because the 30% down payment unnecessarily tied up Risk's funds and inhibited its ability to order more machinery. (Id. ¶ 38.) He sought to eliminate the down payment for certain machinery, and to reduce the down payment to 10% for others. (Id.) This elimination or reduction of the down payment was a particularly sensitive issue to KM since it would be receiving little, if any, money up front while expending significantly more to meet the alleged "new demand." (Id. ¶ 45.) Thus, the financial soundness of Risk and the timely payment of funds was critical to KM's business operations. (Id.) Aghasharif also encouraged KM to purchase two of its competitors' machines and reverse engineer them because Risk needed similar machines for its product line. (Id. ¶ 41.) He noted that KM's "I-line machines" typically sold for approximately $700,000, giving Risk a significant profit margin, and the market for this machinery was very good. (Id. ¶ 35.) He represented that Risk would have no problem whatsoever paying for the equipment because it would not order any machines until it sold them. (Id. ¶ 36.) And he invited KM's key officers to come to the United States to discuss the proposed Exclusivity Agreement.

In April 2012, KM sent four officers to the U.S. to discuss and finalize the Exclusivity Agreement. (SAC ¶ 43.) Over a six-day period, Defendants Williamson, Snyder and Ekers were

-2-

actively involved in the meetings and repeatedly assured KM that there would be no risk of nonpayment to KM since Risk would not order machines until its customers placed orders. (Id. ¶ 49.) They stated that, based on the parties' years of cooperation, KM should have confidence in Risk's ability to pay, and that KM should be at ease regarding this Exclusivity Agreement because Risk was "doing extremely well and experiencing solid growth." (Id. ¶¶ 47-48.) With these inducements and promises, KM signed the Exclusivity Agreement on April 28, 2012, at which time Risk handed KM's officers 42 purchase orders for new machinery. (Id. ¶ 51.)

Following the Agreement, KM manufactured and shipped 11 machines to Risk in the aggregate cost of $787, 036.43. (SAC ¶ 56.) The inability of Risk to pay for the machinery first cropped up in September 2012 when Defendant Ekers requested the shipment of 5 more machines -- claiming that Risk was temporarily "tight on money" but promising to pay KM all the money it was owed in full by the end of October 2012. (Id. ¶¶ 68-71.) KM stated that it would not do so unless Risk agreed to pay 90% of the bill upon arrival. (Id.) Ekers sent an email agreeing to KM's requirement and promising to comply. (Id.) The machines arrived on time, Risk accepted the machines without objection and kept pressing KM for more shipments, but failed to pay for these machines. (Id.) Risk still owes KM nearly $410,000 for these machines. (Id.) Furthermore, KM has manufactured 7 other machines which are sitting in its factory for which Risk owes KM $ 407, 528.96. (Id. ¶ 57.)

On June 20, 2013, KM filed this action against Risk and its principal members and officers, Ian Williamson, Kile Frederick Snyder, Tim Kreja and David Ekers, alleging the following claims: breach of contract, unjust enrichment, fraud, action on account. KM sought to pierce the corporate veil to hold the Individual Defendants personally liable for Risk's debts and

obligations.  The Court held teleconferences with counsel on July 11 and 29 and August 19.[1]

The week before the August 19 teleconference, the Individual Defendants filed a motion to dismiss the claims against them, and Risk filed a motion to dismiss the fraud claim.  (Doc ##: 16, 18.)  Following the August 19 teleconference, the Court issued the following Minutes entry:

> Counsel for Defendant Risk Industries, LLC advised that Risk had sold its assets to a company called Ajax, and the proceeds of the sale are insufficient to pay the secured creditors.  Counsel for Risk agreed to submit documents evidencing the transaction to Plaintiff's counsel and agreed to discuss with Plaintiff a default judgment against Risk. Thus, it appearing the only defendants remaining in this case are the Individual Defendants and the only remaining claim is one for fraud, the Court gave Plaintiff 30 days (to September 18, 2013) to file an amended complaint which alleges with sufficient particularity a fraud claim against all or some of the Individual Defendants.  Accordingly, the CMC presently scheduled for September 13, 2013, is postponed indefinitely, and Plaintiff need not respond to the pending motions to dismiss (Doc ##: 16 and 18) which are hereby denied as moot.  Nothing further has been scheduled.

(Non-document entry of 8/19/2013.)

On September 16, 2013, KM filed an Amended Complaint which again named Risk as a defendant and added new claims for conversion and fraudulent transfer.  (Doc #: 20.)  On September 21, 2013, KM filed a motion to join Ajax Tocco Magnathermic Corp. ("Ajax Tocco") as a defendant.  (Doc #: 21.)  As a basis for the motion, KM stated that Defendants failed to produce the sales documents until after KM filed the Amended Complaint, and the documents that were finally provided showed that Risk transferred substantially all of its assets to Ajax Tocco on or about August 14, 2013 – well after this case was filed.  (Id.)  It is KM's position that

---

[1]Just before the July 29 teleconference, Risk filed a motion to stay proceedings or compel arbitration based on an arbitration clause in the Old (2008) Agreement, neglecting to mention the 2012 Exclusivity Agreement.  When counsel for KM informed the Court during the July 29 teleconference that the Old Agreement had been superseded by the Exclusivity Agreement which contained no arbitration provision at all, the Court directed Risk to withdraw its motion.  (See Doc #: 10 and accompanying docket entry.)

Ajax Tocco/Ajax Manufacturing is the corporate successor to Risk, and KM intends to recover its losses from the assets illicitly transferred. (Id.) KM brought the motion under Fed. R. Civ. P. 25(c), which allows the joinder of a third party when a named defendant transfers assets to that party during the course of litigation. After reviewing the motion, the Court granted it for good cause shown and directed KM to file another amended complaint adding Ajax Tocco along with supporting facts and claims. (Doc #: 22.)

KM filed the Second Amended Complaint adding Ajax Tocco and articulating, with significantly more particularity, the basis for its fraud claims against the Individual Defendants. (Doc #: 24.) Shortly thereafter, the Individual Defendants filed the pending motion to dismiss. The Court has reviewed the Motion and the opposition brief (Doc #: 30 ("Opp.")) and is prepared to issue its ruling.

## II.

A 12(b)(6) motion to dismiss tests the sufficiency of a complaint. To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 550 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

## III.

The Individual Defendants contend that, under O.R.C. § 1705.48(B), they cannot be held personally liable for the debts and obligations of Risk. (Motion at 5-7.) They correctly acknowledge, however, that there is an exception to the limited liability of LLCs for plaintiffs

-5-

who can pierce the corporate veil. (Id. at 7-9.) The exception is rare because, among other things, a plaintiff must show that the individual exercised control over the entity in such a manner as to commit fraud. At the same time, the Individual Defendants contend that the Court must dismiss the fraud claim because it fails to meet the heightened pleading standard of Fed. R. Civ. P. 9(b), and because it arises out of the same conduct as the breach of contract claim and fails to allege losses additional to the contract damages. (Id. at 10-15.) According to the Individual Defendants, "this case is about one thing: King-Mazon's attempt to collect money from Risk Industries for goods it manufactured pursuant to the Exclusivity Agreement. No matter what title Plaintiff ascribes to a cause of action – the gist of the claim is breach of contract." (Id. at 9.) The Court disagrees.

The corporate form may be disregarded and individuals held liable for wrongs committed by the corporation when (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those held to be liable was exercised in such a manner as to commit fraud against the person seeking to disregard the corporate entity, and (3) injury resulted to the plaintiff from such wrong (the *Belvedere* test). *Belvedere Condo. Unit Owners' Ass'n v. R.E. Roark Cos., Inc*., 67 Ohio St.3d 274 (1993), para. 3 of syllabus))*; Springfield v. Palco Invest. Co., Inc*., (Ohio App. 2 Dist. Jun. 7, 2013).

Courts have held that, where a plaintiff has pled sufficient facts to meet the second and third elements of the *Belvedere* test, the question whether an individual exercised the degree of control over a corporation justifying a court in holding the individual personally accountable "is a fact-sensitive question" which should not be answered until the plaintiff has had some

-6-

opportunity to conduct discovery. *Orrand v. Kin Contractors, LLC*, No. 2:09 CV 1129, 2011 WL 1238301, at *4 (S.D. Ohio Mar. 30, 2011) (quoting *Bledsoe v. Emery Worldwide Airlines*, 258 F.Supp. 2d 780, 787 (S.D. Ohio 2011). For the reasons to follow, the Court finds that the Second Amended Complaint contains sufficient factual content which, if proved to be true, shows that the Individual Defendants exerted control over Risk in a manner to commit a fraud.

KM alleges that Risk's agent approached it in March of 2012 in an effort to re-negotiate the parties' then-existing relationship. Risk had to convince KM, which was enjoying success globally, of Risk's financial soundness in order to induce KM to cut ties with other dealers and forego up front payments for the costly machinery Risk ordered. This proposed agreement would benefit KM <u>only if Risk was in fact financially sound at the time and made timely post-delivery payments</u>.

In the six days that KM officers met with the Individual Defendants in April 2012, the Individual Defendants repeatedly represented that Risk was enjoying much success in the United States and was growing internationally; that it made enormous profit margins on the KM machinery it had previously sold; and that there would be no risk to KM because it would not place any orders until the sales were made. Relying on these representations, KM executed the Exclusivity Agreement at the end of April 2012.

Yet less than six months later, questions regarding Risk's financial stability began to appear – starting with Defendant Ekers failed promise to pay 90% for machinery already delivered. More troubling, as late as March 2013, Risk continued to place orders and accept shipments while preparing to liquidate its assets with an auction company. And finally, after KM filed this lawsuit, Risk transferred its assets to Ajax Tocco and/or Ajax Manufacturing –

companies in which certain of the Individual Defendants were officers/insiders – leaving Risk unable to pay its creditors, most notably KM.  Assuming the truth of these allegations, one can reasonably infer that Risk was either insolvent or on the verge of insolvency in April 2012, that the Individual Defendants were aware of this situation at that time, and that they misrepresented Risk's financial stability when inducing KM to enter the Exclusivity Agreement.

The Court finds that these allegations are sufficiently particularized to support not only the second element of the *Belvedere* test, but a claim for fraud under the heightened pleading standards of Rule 9(b).  *Fortress Value Recovery Fund, LLC v. Columbus Components Group LLC*, No. 1:11 CV 200, 2011 WL 1130442, at *6 (N.D. Ohio Mar. 28, 2011) (citing *Southeast Tex. Inns, Inc. V. Prime Hospitality Corp.*, 462 F.3d 666, 672 (6th Cir. 2006).  Furthermore, the allegations are sufficient to support a claim under the Ohio Fraudulent Transfer Act, which is not subject to the heightened pleading requirements of Rule 9(b).  *Id.* (citing *Van-American Ins. Co. V. Schiappa*, 191 F.R.D. 537, 542 (S.D. Ohio 2000).

The Court also concludes that KM is able to meet the third element of the *Belvedere* test.  The third element is satisfied if the plaintiff alleges that it has been unable to collect on a debt due to the defendant's conduct.  *Fortress Valley*, 2011 WL 1130422, at *6.  There is no dispute that KM has been unsuccessful in its attempts to collect approximately $400,00 for shipments delivered to Risk and approximately $400,000 for machinery made to Risk's specifications but sitting in KM's factory.

Because the Court has found that KM has pled sufficient factual content to meet the second and third elements of the *Belvedere* test and due to the egregious nature of the allegations, the Court concludes that the question whether any of all of the Individual Defendants

-8-

exercised the degree of control over Risk to justify holding the Individual Defendants personally liable will remain open until the plaintiff has had an opportunity to conduct discovery. *Orrand*, 2011 WL 1238301, at *4; *Bledsoe*, 258 F.Supp. 2d at 787.

The Individual Defendants also argue that the Court must dismiss the fraud claim because it arises out of the same conduct as the breach of contract claim. (Motion at 11-12.) Again, the Court disagrees. In a similar case, the district court held that while a fraud and breach of contract claim both arose in part from a defendant's failure to pay for the plaintiff's services, the fraud claims were based on the defendant's alleged intention not to perform the contract at the time it was entered into and its breach of contract claim was based on the defendant's purported nonperformance regardless of its intention at the outset or at the time of the breach. *Resource Title Agency, Inc. v. Morreale Real Estate Servs., Inc*., 314 F.Supp.2d 763, 774-75 (N.D. Ohio 2004). Likewise, KM's claim for fraudulent inducement arises out of the Individual Defendants' alleged intent not to perform the Exclusivity Agreement at the time it was executed, while its contract claim arises from the Individual Defendants' failure to perform the contract at the time of the breach.

### III.

Based on the foregoing, the Court **DENIES** the Motion to Dismiss of Defendants Ian Williamson, Kile Frederick Snyder, Tim Kreja and David Ekers (**Doc #: 28**).

**IT IS SO ORDERED.**

*/s/ Dan A. Polster     October 25, 2013*
**Dan Aaron Polster**
**United States District Judge**